UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT BECKLEY

TRINITY HOLDINGS, LLC,

       Plaintiff,

v.                           Civil Action No. 5:21-cv-00238

WV CROSSROADS REALTY, LLC;
WV CROSSROADS CH, LLC; and
WV CROSSROADS NASSIM, LLC,

       Defendants.

<u>MEMORANDUM OPINION AND ORDER</u>

Pending are Plaintiff Trinity Holdings, LLC's Motion for Summary Judgment (ECF No. 52), filed February 3, 2022, and Defendants' WV Crossroads Realty, LLC, WV Crossroads CH LLC and WV Crossroads Nassim, LLC, Motion for Summary Judgment (ECF No. 54), filed February 3, 2022.

## I. Procedural Background

This case arises from a contract dispute between plaintiff Trinity Holdings, LLC ("Trinity") and defendants WV Crossroads Realty, LLC; WV Crossroads CH, LLC; and WV Crossroads Nassim, LLC (collectively "Crossroads").

Trinity instituted this civil action on April 15, 2021, alleging breach of contract with respect to the sale to it of real property by Crossroads and seeking specific performance. ECF No. 1, at 10-12.  The case was filed in this court on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332. Id. at 2.

On May 28, 2021, Crossroads answered Trinity's complaint and asserted a counterclaim that subsection 5(e) of the Purchase Contract, under which Crossroads is to bring utility lines to within five feet of the property, was unconscionable.  ECF No. 10, at 14.  Trinity moved to dismiss the counterclaim on June 18, 2021.  ECF No. 11.  The court granted the motion to dismiss on January 28, 2022, finding that Crossroads had failed to sufficiently plead that the contract provision at issue was procedurally unconscionable.  ECF No. 51, at 7.

These motions for summary judgment followed.

## II. Legal Standard

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material" facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010).  A "genuine" dispute of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-moving party.  Anderson, 477 U.S. at 248.

Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  A party is entitled to summary judgment if the record, as a whole, could not lead a rational trier of fact to find for the non-moving party.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).  Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.

### III. Facts and Analysis

In late October 2019, the parties began negotiating the sale of a 0.75-acre piece of land near the Crossroads Mall in Mount Hope, West Virginia (the "property").  ECF No. 53, at 2; ECF No. 55, at 1.  Trinity states that it intended to purchase the land "to construct and operate a Taco Bell on the Property."  ECF No. 53, at 1.

The negotiations continued over a period of seven months until the "Purchase Contract" was executed by Trinity on May 26, 2020, and by Crossroads on June 8, 2020, the latter being its "Effective Date."  Purchase Contract, ECF No. 54-2. The parties agreed to a purchase price of $360,000.00, of which a $10,000.00 deposit was made by Trinity for the benefit of Crossroads within five days of signing.  Id. at § 2.

The contract contained the following provision in Section 5(e) that is the focal point of the dispute between the parties:

> **Utilities. Seller, at its sole cost and expense**, shall make available to within five (5) feet of Property boundaries the following utilities of suitable capacity for Buyer's proposed Quick Service Restaurant: storm and sanitary sewer, water, electricity, phone and cable/internet, gas.

Id. at § 5(e) (emphasis in original).

4

The contract provided Trinity with an investigation and inspection period of 150 days and an extension period of 60 days to secure permits and approvals relating to the property. Id. at § 5.  Crossroads concedes that "Section 5 states that buyer shall have a total of a 210-day inspection period to complete its investigation of the property."  See ECF No. 55, at 2.  That would put the end date as January 4, 2021.

After the contract was executed, Crossroads balked at providing the utilities within five feet of the property line when it later learned that it would cost some $250,000.00 to do so.

Crossroads now claims that "Plaintiff waived the condition set forth in Subsection 5(e) by failing to provide written notice to Crossroads Defendants concerning the condition as set forth at the outset of Section 5 and that the astronomical cost of providing the utilities to the site was not foreseen by either party to the contract such that there exists a mutual mistake of fact and/or no true meeting of the minds as to the terms of the agreement."  ECF No. 55, at 2.

A.    <u>Mutual Mistake/Meeting of the Minds</u>

"A mutual mistake is one which is common to all parties, wherein each labors under the same misconception respecting a material fact or provision within the contract." Syl. Pt. 4, <u>Smith v. Smith</u>, 639 S.E.2d 711 (W. Va. 2006).

Crossroads argues that a mutual mistake was made because "[n]o party to this deal reasonably believed that the utility work contemplated under Subsection 5(e) would cost at least $250,000." ECF No. 55, at 8.

Trinity first learned that Crossroads was not undertaking to extend the utilities when, on August 3, 2020, James Fultz, the Taco Bell Director of Real Estate for Charter Foods,[1] sent an email to Benjamin Sedaghatzandi, an attorney with Hakimi Law, at the email address listed for him in Section 20 of the contract, ben@hakimilawny.com. ECF No. 58-1, at 3. The email also went to Jack Bassal and Igal Nassim, both of Mason Asset Management, as to whom Nassim testified, "Mason is responsible for the leasing and sales at the property." <u>Id.</u>; ECF

---

[1]    According to James Fultz, Charter Foods "includes Charter Central, LLC," which was planning to "construct and operate a Taco Bell restaurant in Mount Hope, WV on a site purchased by Trinity Holdings, LLC[.]" ECF No. 58-3, at 2. Fultz states that he "was the person who was primarily responsible for negotiating the Purchase Contract on behalf of Trinity." <u>Id.</u> at 3.

No. 54-1, at 3-4.  Fultz's email was sent to Nassim at the email address igal@masonam.com and to Jack Bassal at jack@masonam.com. The email was carbon copied to another individual at Hakimi Law, Romina Benzakarya, at the email address romina@hakimilawny.com.[2]

The email asked, "[W]ould I be correct to assume that you plan on bringing the utilities to within 5' of the property boundaries once we waive our due diligence and complete this before we close?"  ECF No. 58-1, at 3.

Nassim replied to Fultz on August 4, 2020, stating, "I don't remember agreeing to bringing utilities within 5' of the property boundary.  This would need to be buyer's responsibility."  Id. at 3.  Fultz replied and directed Nassim to review Section 5(e) of the Purchase Contract.  Id.  Both Nassim and Fultz's August 4, 2020 emails were sent to Bassal, Sedaghatzandi, and Benzakarya at the above listed addresses.

On August 10, 2020, Nassim wrote to Fultz:

How far are the utility lines from the property now?

This was a major oversight, I don't know why no one brought this to my attention earlier.  We never agree to this.

Id. at 2.

---

[2]     The email also went to Ibrahima Diallo of Charter Foods.

Indeed, Crossroads did so agree after extensive negotiations on the very point over a period of several months beginning in December 2019.

The first proposal, or letter of intent, contained the following provision regarding utilities: "Seller hereby warrants that all utilities (public sewer, water, gas, electric, phone and cable/internet) are currently available and servicing the Property."  ECF No. 52-1, at 13.[3]

A February 14, 2020, draft of the Purchase Contract similarly stated that "Seller warrants that all utilities (public sewer, water, gas, electric, phone and cable/internet) of suitable and sufficient capacity are currently available at the boundary of the Property to be sold."  Id. at 19.[4]  It is in this February 14, 2020, draft that the utilities provision is first placed under Section 5 of the Purchase Contract (entitled "Buyer Conditions and Inspection Period").

---

[3]    Emails between Fultz and Bassal show that this first proposal was negotiated between December 9, 2020 and December 24, 2020.  ECF No 52-1, at 7–12.
[4]    The court notes that this draft of the Purchase Contract is undated; however, in his affidavit, Fultz attests that the draft was completed on February 14, 2020.  ECF No. 52-1, at 3 (¶ 9). Crossroads does not dispute the authenticity of this draft.

A March 5, 2020, draft of the agreement amended the utilities provision, appearing in Section 5(e).  The provision no longer warranted that the utilities were currently available but instead stated:

> **Utilities. Seller, at its sole cost and expense, shall make available to within five (5) feet of Property boundaries the following utilities of suitable capacity for Buyer's proposed Quick Service Restaurant: sewer, water, electricity, phone and cable/internet, gas**.

Id. at 32 (emphasis in original).[5]

A March 9, 2020, email from Crossroads' lawyer, Ben Sedaghatzandi, to Jack Bassal at his masonam.com email address and others,[6] which was forwarded to Fultz on the same day, stated that "[u]tilities are available to the parcel."  Id. at 45. Attached to that email was a draft of the Purchase Contract in which Crossroads had appeared to accept the language from the March 5, 2020 draft.  Id. at 49.

On March 31, 2020, emails between Fultz and Sedaghatzandi show that the parties continued to negotiate the provision.  Therein Fultz asked if Section 5(e) could be amended

---

[5]    Again, the date of this draft is provided by Fultz in his affidavit and is not contested by Crossroads in any of its briefing or exhibits.  ECF No. 52-1, at 3 (¶ 10).
[6]    This email was also sent to the aforementioned Romina Benzakarya at Hakimi Law as well as Brian Banilivy at the email address brian@masonam.com.

to include both "'storm and sanitary sewer' rather than just 'sewer.'"  Id. at 64.  After asking for clarification of the meaning of "storm and sanitary sewer" and conferring with the seller, Sedaghatzandi sent Fultz an email stating, "The Sellers are accepting the additional comments regarding the sewer."  Id. at 62.  The following day Sedaghatzandi sent Fultz an updated copy of the Purchase Contract which incorporated the amendment. Id. at 66, 69.  The April 1, 2020, draft is where the utilities provision takes its final form:

> (e) Utilities. Seller, at its sole cost and expense, shall make available to within five (5) feet of Property boundaries the following utilities of suitable capacity for Buyer's proposed Quick Service Restaurant: storm and sanitary sewer, water, electricity, phone and cable/internet, gas.

Id. at 69 (emphasis in original).  The April 1, 2020, draft is also the first time the provision appears with "Seller, at its sole cost and expense" emphasized apart from the rest of the provision.

The final version of the Purchase Contract was executed by Trinity on May 26, 2020, and by Crossroads on June 8, 2020, and contained the utilities provision set forth above.

It is apparent that Crossroads was fully aware of the utilities provision when it executed the Purchase Contract.  As a real estate developer of property in the Crossroads Mall

project, it ought to have been fully aware as well of the cost of fulfilling its agreement, "at its sole cost and expense," to bring the covered utilities to within five feet of the property. On the other hand, there is no evidence presented that would indicate there was any mistake on Trinity's part as to the cost required of Crossroads.

The utilities provision is found in Section 5 of the Purchase Contract which provides as follows:

> 5. <u>Buyer Conditions and Inspection Period</u>.  All of Buyer's duties and obligations under this Contract shall be conditioned upon and subject to the complete satisfaction of Buyer's investigations and inspections, each of which is for the sole benefit of Buyer, and any of which may be waived by Buyer at Buyer's sole discretion.  Buyer shall have one hundred fifty (150) days (the "Inspection Period") from the Effective Date to complete its investigation of the Property.  Thereafter the Buyer may elect to extend the Inspection Period for an additional sixty (60) days to secure permits and approvals relating to the Property (the "Inspection Period Extension") upon delivery of written notice of such election to extend to Seller on or before the expiration of the Inspection Period..  If Buyer fails to notify Seller of its waiver or satisfaction of each of the conditions listed below within the designated Inspection Period or Inspection Extension Period, such conditions shall be deemed waived.  During the Inspection and Inspection Extension Period, Buyer shall complete the following to its satisfaction, prior to the expiration of the Inspection Period.

Purchase Contract § 5 (emphasis in original).

The "conditions listed below" are nine in number and set forth seven conditions that are to be completed by Trinity to its satisfaction and two that are to be completed by Crossroads.  The titles of the seven, which embrace those matters of primary concern to a buyer of real estate, and the first three of which are specified to be at Buyer's "sole cost and expense," are as follows:

> (a) Title
> (b) Survey
> (c) Environmental Investigation
> (d) Zoning Verification
> (f) Flood Plain
> (g) Geological Borings
> (h) Development Plan

The titles and full provisions of the two that are to be completed by Crossroads are as follows:

> (e) Utilities. Seller, at its sole cost and expense, shall make available to within five (5) feet of Property boundaries the following utilities of suitable capacity for Buyer's proposed Quick Service Restaurant: storm and sanitary sewer, water, electricity, phone and cable/internet, gas.
>
> (i) Gates. Prior to Closing, Seller shall remove, at its sole cost and expense, the main and secondary entrance gates to the Mall as generally shown in Exhibit C.  The removal of the main and secondary entrance gate shall be an additional consideration for Trinity's entry into this Agreement.  This section shall survive Closing.

(emphasis in original).

Not only do each of these two provisions make it quite clear that they are to be performed and completed by Crossroads at its sole cost and expense, but the utilities provision contains an emphasis that is nowhere found in any place in the lengthy 11-page single spaced Purchase Contract except for the provision headings; that is, the utilities provision begins as follows: <u>Utilities. Seller, at its sole cost and expense</u>, shall make available (etc.).

As to the cost, there is an absence of evidence that Trinity labored under the same misconception as Crossroads, whatever it was, as to the expense of fulfilling the utilities provision.

Similar to its mutual mistake argument, Crossroads submits that

> [t]o the extent that Trinity Holdings believes that the Crossroads Defendants are contracted to pay for the entirety of the utilities work despite the lack of foreseeability of the extreme cost to do so and the untenable nature of the deal caused by the absence of understanding, no meeting of the minds ever occurred in this case and the purchase contract simply does not exist as the parties fail to reach mutuality.

ECF No. 55, at 9.

"A meeting of the minds of the parties is a <u>sine qua non</u> of all contracts."  Syl. Pt. 1, <u>Martin v. Ewing</u>, 164 S.E.

859 (W. Va. 1932).  Minds have not met when the parties have not agreed to the vital elements of the contract.

Crossroads' meeting of the minds argument fails. There is no question that all parties understood what was required of them under the Purchase Contract.  The mere fact that Crossroads incorrectly predicted the cost of its obligations does not amount to a lack of mutual assent.  <u>See</u> <u>Ryan v. Ryan</u>, 640 S.E.2d 64, 69 (W. Va. 2006) ("If a party could reform or rescind a contract on the ground that an expectation as to future results or occurrences was mistaken, the stability and binding force of many contracts would be destroyed.").

The parties negotiated this contract for more than seven months, including specific negotiations about the utilities provision.  Accordingly, the parties had sufficient time to negotiate and understand their obligations and Crossroads had ample opportunity to investigate the cost of its obligations before it signed the Purchase Contract in June 2020.

B.   <u>Waiver</u>

Crossroads also argues that Trinity waived its right to have the utilities brought within five feet of the property. Crossroads posits that Section 5 "set[s] forth conditions that Trinity Holdings either had to accept or waive before Trinity Holdings' obligations under the purchase contract are made effective."  ECF No. 55, at 7.  Accordingly, Crossroads states that "[i]f one of the conditions was not satisfied, the purchase contract gave Trinity holdings the option to either (1) waive the conditions; or (2) terminate the contract.  By failing to notify Crossroads Defendants in writing as to the option to be exercised by Trinity Holdings, Trinity Holdings waived the condition as a term of the contract."  <u>Id.</u>

Under West Virginia law, "a valid written agreement using plain and unambiguous language is to be enforced according to its plain intent and should not be construed."  <u>Toppings v. Rainbow Homes, Inc.</u>, 490 S.E.2d 817, 822 (W. Va. 1997).

Although the language of Section 5 is oddly drawn, neither party suggests the language is ambiguous.  Accordingly, the court is to adopt the plain meaning of the provision.

An analysis of Section 5 begins with the first sentence which relates to the "Buyer's duties and obligations under this Contract."  The next two sentences fix the Inspection Period and its extension.  The fourth sentence reads as follows:

> If Buyer fails to notify Seller of its waiver or satisfaction of each of the conditions listed below within the designated Inspection Period or Inspection Extension Period, such conditions shall be deemed waived.

Under that sentence, if the Buyer fails to notify Seller of Buyer's waiver or the Buyer's satisfaction of the conditions listed below those conditions are waived.  The Buyer, however, is not the one who is to satisfy the utilities and gate conditions listed below – that is the obligation of the Seller. And the Buyer has insisted on the fulfillment of the utilities provision rather than waive it.

So it is that the phrase, "satisfaction of," as set forth in the fourth sentence, does not relate to Buyer's satisfaction <u>with</u> the conditions listed below, which could mean all of them; but rather to Buyer's satisfaction <u>of</u> the conditions listed below, which necessarily excludes the utilities and gate conditions that are the sole obligation of the "Seller, at its sole cost and expense."

The last sentence reads as follows:

> During the Inspection Period and Inspection
> Extension Period, Buyer shall complete the
> following to its satisfaction, prior to the
> expiration of the Inspection Period.

Again, as to the utilities, it was not the obligation of the

Buyer but that of the Seller to "complete" the utilities.

Such a reading is consistent with West Virginia law

which provides that a contract should be read to give meaning to

all of its terms.  See Syl. Pt. 3, Moore v. Johnson Serv. Co.,

219 S.E.2d 315, 317 (1975) ("[S]pecific words or clauses of an

agreement are not to be treated as meaningless, or to be

discarded, if any reasonable meaning can be given them

consistent with the whole contract.").

Inasmuch as there was a complete failure of Crossroads

to comply with its agreement to provide the specified utilities,

there was not only nothing for Trinity to waive, but Trinity

undertook to prod Crossroads to fulfill its obligations on a

continuing basis to no avail during and after the Inspection

period as is seen in the section that follows.

C.   **Notice**

Section 20 of the Purchase Contract indicates where "[a]ll notices and other communications required or permitted to be given" under the contract should be sent and specifies that they are effective "upon receipt, if delivered by email with confirmed transmittal." The court notes that confirmed transmittal is not shown but finds the notices given to be effective inasmuch as they generated a response to the extent noted herein.

Under Section 20, notices to the seller are to be sent to the following:

```
c/o Namdar Realty Group, LLC      with a copy to:
150 Great Neck Road, Ste. 304     Hakimi Law, PC
Great Neck, NY 11021              Attn: Romina Benzakarya, Esq.
Tel: (516) 708-9736               150 Great Neck Road, Suite 304
Email: elliot@masonam.com         Great Neck, NY 11021
                                  Tel: (516) 708-9736
                                  Email: Romina@hakimilawny.com
                                  Ben@hakimilawny.com
```

Purchase Contract § 20. As is obvious, both the Namdar Realty Group and the Hakimi Law firm acting for Crossroads share the same New York address and telephone number.

Upon a review of the exhibits supplied by Trinity, the court is satisfied that Trinity provided sufficient written notice to Crossroads that Section 5(e) was not being completed

during the inspection period and that Trinity wanted Crossroads to comply with its agreement under that provision.

Between August of 2020 and January of 2021, Fultz sent numerous emails inquiring about the status of the utilities. ECF No. 58-3, at 6–14.  Aside from the August exchange earlier noted between Fultz and both Nassim and lawyer Sedaghatzandi, one such email, dated October 12, 2020, from Fultz to Nassim read:

> I have left several messages for you at your office, and I understand that you have a new addition to your family.  Congratulations.  However, we need to discuss this.  Our due diligence ends 11-5-20, and we have one 60 day-option.  We would like to move this to closing, but we need to know when you will have the utilities brought to the site as per the contract.  Please call me so that we can discuss.

Id. at 10–11.[7]  Although there is no written response by Nassim in the record, it appears there was a response the next day as set forth in the November 9, 2020 email from Fultz to Nassim at his igal@masonam.com email address:

> When we spoke on 10-13-20, you were going to get estimates to bring the utilities to site.  Have you completed this?

---

[7]    As noted above, the August 3–4, 2020 emails were sent to Ben Sedaghatzandi and Nassim at the following addresses: ben@hakimilawny.com and igal@masonam.com.

Id. at 10.  Nassim did not respond, and on November 16, 2020, Fultz followed up with an email asking, "Any progress on this?" Id.  Nassim answered Fultz on November 18, 2020 stating, "I haven't heard anything from our construction guy. I'll check back with him and let you know."  Id. at 9.

Throughout November and December 2020, Fultz repeatedly asked Nassim about Crossroads' acquisition of an estimate for bringing utilities to the property.  Id. at 8–10.

On November 23, 2020, Fultz asked Nassim, "Any update from your construction guy?"  Id.  The following day, November 24, 2020, Nassim emailed Fultz and advised, "He said we expects (sic) to have an estimate within the next few days."  Id. Nearly two weeks later, on December 7, 2020, Fultz inquired of Nassim, "Have you received and reviewed the estimate from your construction guy?"  Id. at 8.  Fultz repeated the inquiry a week later on December 15, 2020, asking, "Any update on your construction estimate?"  Id.

Internal emails on December 22, 2020 between Nassim and Joshua Kashanian, a project manager for Namdar Realty Group,[8] reveal that the estimate for bringing the utilities to the property was $250,000.00.  ECF No. 52-4, at 18.  After Kashanian

---

[8]    Nassim testified that Kashanian "oversees construction" for Namdar Realty Group.  ECF No. 54-1, at 12.

told Nassim the amount, Nassim sent him an email the same day
stating:

> It's a $350k deal.
> I'm going to try to just back out of it.

Id. at 17.

The same day, Nassim stated in an email to Fultz that
he had received an estimate from the construction team and asked
Fultz to give him a call. ECF No. 58-3, at 8–9. It appears,
however, that the estimate was not conveyed immediately, though
Fultz indicates knowledge of it in at least one of his two
emails next below. A January 4, 2021, email from Fultz to
Nassim stated, "I have tried to reach you to discuss your
estimate. We would like to move to closing on this site, but
need to know where you stand with the estimate and bringing the
utilities to the site." Id. at 7. Fultz and Nassim conversed
the next day and on January 6, 2021, Fultz emailed Nassim,
asking for a copy of the "$250,000 bid." Id. at 6–7.

By email to Nassim on January 11, 2021, Fultz proposed
that the parties proceed to closing with Trinity placing
$250,000.00 of the purchase price, the estimate to bring the
utilities to the property, in escrow. ECF No. 58-3, at 6.

A similar email, dated January 28, 2021, from Fultz to
Sedaghatzandi asks Crossroads to allow the parties to move to

closing.  The email states, "Although the Seller has yet to bring the utilities to our site, we are willing to close on the property with $250,000 of the purchase price remaining in escrow until the Seller completes the utility work."  ECF No. 58-3, at 18.  This email was carbon copied to Nassim.

On February 8, 2021, Crossroads, via an email from Sedaghatzandi, indicated that it would only move to closing if "Buyer is satisfied with the Property currently."  ECF No. 58-3, at 17.  Since that time, Crossroads has refused to bring the utilities to the site and the parties have not closed on the property.

Although Trinity's written notice did not follow the precise procedure set forth in Section 20, it is apparent that Trinity's representative was regularly corresponding with people in positions of authority for Crossroads – including Sedaghatzandi, a representative of the law firm who negotiated the Purchase Contract provisions on Crossroads' behalf, and Nassim who appears to have been the decision-maker given his statements advising Fultz in August 2020: "Why wasn't this called to my attention.  We never agree to this" and his comment to the project manager overseeing construction for Namdar in December 2020 that he was "going to try to just back out of [the contract]."

Sedaghatzandi's email address is listed as one of the addresses at which to send the seller notice. <u>See</u> Purchase Contract § 20. Although Nassim's email address is not the exact email address listed in Section 20, he works for Mason Asset Management and shares the same email address domain as the contact for Namdar Realty Group that is listed in Section 20.

Finally, a review of Section 20 reveals that the individuals to whom notice was to be sent for the seller - Namdar Realty Group LLC and Hakimi Law, P.C. - share the same physical address and telephone number as earlier noted with each other, and with Sedaghatzandi.[9]

The totality of these facts leads to the conclusion that Crossroads did in fact, on multiple occasions, receive written notice within the inspection period prescribed by Section 5 that the utility condition had not been satisfied and that Trinity expected Crossroads to satisfy it.

---

[9]    Sedaghatzandi lists 150 Great Neck Road, Suite 304, Great Neck, NY 11021 as his address on his email signature. <u>See</u> ECF No 58-1.

D.   <u>Availability and Equity of Specific Performance</u>

Section 13(a) of the Purchase Contract provides the available remedies in the event of default by the seller.  That section states as follows:

> (a) <u>Default by Seller</u>.  If the Buyer has performed all of the obligations of Buyer hereunder and Seller intentionally breaches this Contract, then Buyer, may elect, as its sole and exclusive remedy, to either:
>
> (i) treat this Contract as terminated, and receive a refund of the Earnest Deposit . . . or
>
> (ii) treat this Contract as being in full force and effect and Buyer shall have the right to an action for specific performance.  Seller shall reimburse Buyer for its actual expenses in connection with such action for specific performance, including, but not limited to, all reasonable attorneys' fees, court costs, and related expenses, provided Buyer is the prevailing party.
>
> (iii) In the event specific performance is not available due to Seller's actions, Buyer shall be entitled to reimbursement for all of its actual expenses incurred for its investigation of the Property under Section 5, herein, as evidenced by paid invoices to third parties whereas said expense shall not exceed $25,000.00.

<u>Id.</u> at § 13(a) (emphasis in original).

Despite this provision, Crossroads argues that an award of specific performance in this case would be improper and unjust because Crossroads "would suffer a loss on the sale of commercial real estate based upon facts that were latent and

24

unknown to the parties at the time the contact was executed." ECF No. 55, at 11–12.

"When land is the subject matter of the agreement, the legal remedy is assumed to be inadequate, and specific performance is available since each parcel of land is unique.  Thus, specific performance is the presumed remedy for the breach of an agreement to transfer real property."  71 Am. Jur. 2d Specific Performance § 130.  "Generally courts of equity will decree specific performance when the contract is in writing, is certain and fair in all its terms, is free of fraud, misapprehension or mistake, is for an adequate consideration, and is capable of being performed."  Brand v. Lowther, 285 S.E.2d 474, 479 (W. Va. 1981).

In this case, a grant of specific performance does no more than enforce the plain terms each side agreed to when they entered into the Purchase Contract.  The court has not made a finding of fraud, lack of mutuality, or mutual mistake.  The contract was made for adequate consideration, and it is capable of being performed.  Most significantly, the Purchase Contract specifically provides Trinity with a right to elect specific performance as its "sole and exclusive remedy."  See Purchase Contract § 13(a).

While Crossroads argues that specific performance is inequitable because it will not receive the benefit of the bargain it believed it was getting, that fact does not necessitate a finding of inequity.  It is not the court's role to ensure that Crossroads makes a sizable profit for the sale of its commercial property.  Crossroads understood its obligations at the time it entered the contract.  While it may be unfortunate that it may not have done its own due diligence to understand the cost of its promises, the court finds nothing unjust about enforcing the terms to which the parties agreed.[10]

In sum, even viewing the facts in the light most favorable to Crossroads, no reasonable factfinder could find that Crossroads did not breach intentionally the Purchase

---

[10]   Crossroads also proclaims that an order of specific performance would be "unconstitutional as applied given its potential requirement that the Crossroads Defendants involuntarily take on a massive construction project."  ECF No. 62, at 6; ECF No. 60, at 6 (suggesting that specific performance would violate the Thirteenth Amendment's prohibition against slavery or involuntary servitude).

While it is generally accepted that "orders for specific performance of non-delegable personal services violate public policy as represented by the Thirteenth Amendment," William J. Rich, Modern Constitutional Law § 18:6, this argument is inapplicable to the case at hand.  A grant of specific performance in this case does not require Crossroads to provide personal services to physically construct anything.  It simply requires it to pay for the provision of utilities within five feet of the property it is selling, as it specifically agreed to do.

Contract, whereas Trinity has fulfilled its obligations under the contract and stands ready to pay the purchase price.

Moreover, inasmuch as the Purchase Contract provides for the remedy of specific performance and Crossroads has provided no persuasive argument that necessitates a finding that specific performance is not appropriate in this case, the court finds that Trinity is entitled to summary judgment on its claim for specific performance.

The parameters of the specific performance to be awarded shall be provided by court order after the court has had the opportunity to hear from both parties as set forth last below.

E.   <u>Limitation of Damages</u>

Subsection 13(a)(iii) provides that

[i]n the event specific performance is not available due to Seller's actions, Buyer shall be entitled to reimbursement for all of its actual expenses incurred for its investigation of the Property under Section 5, herein, as evidenced by paid invoices to third parties whereas said expense shall not exceed $25,000.00.

Crossroads argues that "[t]his subsection sets forth the parties' expectation as to the total expected liability and risk related to a potential breach of contract."  ECF No. 55, at 13.

Despite Crossroads' attempt to portray subsection 13(a)(iii) as a general "damages cap," the plain language of the provision states that it only comes into play "[i]n the event specific performance is not available[.]"  Purchase Contract § 13(a)(iii).  Inasmuch as Crossroads has failed to convince the court that specific performance is unavailable or otherwise inappropriate, the limitations of subsection 13(a)(iii) have not been triggered and, therefore, the court denies Crossroads' request to cap Trinity's damages at $25,000.00.

F.   <u>Attorneys' Fees</u>

In addition to a finding that Crossroads breached the Purchase Agreement, Trinity also asks the court to find that it is entitled to recover its litigation costs from Crossroads.

While attorneys' fees are generally not available in breach of contract actions, two separate provisions of the Purchase Contract support such an award.

Section 13(a)(ii) provides that Buyer has a right to an action for specific performance and that "Seller shall reimburse Buyer for its actual expenses in connection with such action for specific performance, including, but not limited to, all reasonable attorneys' fees, court costs, and related expenses, provided Buyer is the prevailing party."

Section 19(b) similarly states that "[i]n connection with any litigation arising out of this Contract, the prevailing party shall be entitled to recover all related litigation or legal costs incurred, including reasonable attorney's fees."

Inasmuch as the court has determined that Trinity is entitled to specific performance of the Purchase Contract, it is the prevailing party in this civil matter.  The Purchase Contract plainly provides that Trinity is entitled to recover its litigation expenses, including attorneys' fees.

### IV.   Conclusion

For the foregoing reasons, the court ORDERS that:

1.   Plaintiff Trinity Holdings, LLC's Motion for Summary Judgment (ECF No. 52) be, and hereby is, granted.

2.   Defendants' WV Crossroads Realty, LLC, WV Crossroads CH LLC and WV Crossroads Nassim, LLC, Motion for Summary Judgment (ECF No. 54) be, and hereby is, denied.

3.   All remaining dates on the court's scheduling order be, and hereby are, cancelled.

4.   A hearing on the parameters of the court's order of specific performance and how it should be effected be, and hereby is, scheduled for 11:00 AM on June 23, 2022, at the

Robert C. Byrd United States Courthouse in Charleston, West
Virginia.

       Trinity's brief on the parameters of specific
performance and how it should be effected shall be submitted on
or before June 7, 2022.  Crossroads shall have until June 14,
2022 to file a response, with any reply by Trinity to be filed
by June 21, 2022.

       The Clerk is directed to transmit copies of this
memorandum opinion and order to all counsel of record and any
unrepresented parties.

      ENTER: May 24, 2022

      John T. Copenhaver, Jr.
      Senior United States District Judge